## SAMMONS et al. v. SCHWARZ et al.

District Court, S. D. New York.
May 26, 1944.

Kaufman & Cronon, of New York City (Samuel H. Kaufman and Milton S. Gould, both of New York City, of counsel), for plaintiffs.

Cornelius B. Chapman, of New York City, for defendant Schwarz.

Morris Schmulbach, of New York City, for defendant Rocker.

Henry E. Coleman, of New York City, for defendant W. W. I. W. H.

EDWARD A. CONGER, District Judge.

Action by the plantiffs herein against defendants arising out of the proposed publication of a book known as "Who's Who in the Western Hemisphere." Charles Loffer, named in the complaint as one of the defendants, was never served with process herein.

There are two causes of action set forth in the complaint. The first cause of action is based upon an agreement made and entered into on or about the 4th day of March, 1940 between the present plaintiffs and the defendant Julius C. Schwarz and others. The defendants, Rubin

Rocker and the corporation W. W. in Western Hemisphere, Inc., were not parties to this agreement. It should be noted at this point that the corporation above named is solely owned and controlled by the defendant Rubin Rocker, he being the only stockholder thereof.

The plaintiffs are the owners and publishers of the book, Who's Who in America. It is "a biographical dictionary of notable living men and women of the United States" and has been published in 22 editions commencing in 1899. The work is recognized as a standard biographical reference work.

Defendant Rocker and the defendant corporation claim to have in process of publication a work known as "Who's Who in the Western Hemisphere" which is designated as "A biographical encyclopedia designed to promote Pan American cultural relationship and to advance the cause of hemispheric solidarity."

At the time of the trial this book was in process of being printed.

In 1940 plaintiffs commenced an action in the Federal District Court for the Southern District of New York against defendant Schwarz and others alleging trade mark infringement and unfair competition. Just prior to that time Schwarz had been publishing certain books known as Who's Who in Government, Who's Who in the Law and Who's Who in the Clergy, and others.

The action in 1940 arose because of the publication of one of these books by Schwarz. This action was not tried but was compromised by the agreement of March 4, 1940.

In and by this agreement, Schwarz covenanted and agreed "that he would not at any time after the date thereof, either directly or indirectly, print, publish, vend, sell or cause to be printed, published, vended or sold, any book containing as part of its title or subtitle the words 'Who's Who', and that he would not as stockholder, officer or director of a corporation, partner, or otherwise, take any part in any printing, publishing, vending or selling any book or work containing the words 'Who's Who' in or as part of its title or subtitle; and Defendant Schwarz did also covenant and agree that he would not have any direct or indirect connection with or interest in the printing, publishing, vending, or selling of any such book or work containing the words 'Who's

Who' in its title or subtitle, as proprietor, partner, stockholder, corporate director, officer or otherwise."

There are certain exceptions in the agreement in connection with the above covenant. They, however, do not affect the question at issue. Under the above covenant, if it is valid, Schwarz would be prevented from publishing or attempting to publish the book "Who's Who in the Western Hemisphere."

The alleged publisher and producer of the book was Rubin Rocker and later his corporation, "W. W. in the Western Hemisphere, Inc."

Plaintiffs' contention, upon which they base their first cause of action, is that in fact the defendant Schwarz is the real publisher of the book or at least one of the publishers of the book and that Rocker and the corporate defendant are carrying on the work for Schwarz.

Plaintiffs' contention being that Schwarz and the other two defendants are engaged in editing and preparing for publication, "Who's Who in the Western Hemisphere" and that all of the defendants Schwarz, Rocker and the Corporation have knowledge of this restrictive covenant on the part of Schwarz and have agreed together that the publication of said work be carried on under the name of the defendant Rocker and later under the corporate name and that the interests of the defendant Schwarz and his connection with the work shall be concealed.

The gravaman of the first cause of action is that Schwarz and Rocker have entered into a conspiracy to get around and circumvent the provisions of the restrictive covenant to the end that this work, while it apparently is the work of Rocker and his Corporation, is really the work of Schwarz; at least that Schwarz' interest is concealed and that his interest in the work is of such a character that it comes within the prohibition of the restrictive covenant in the said agreement.

■ I am satisfied that the complaint sets forth a good cause of action.

The answer of the defendant Schwarz admits the making of the agreement of May 4, 1940 but denies that he has any connection with "Who's Who in the Western Hemisphere," except that he was employed in an editorial capacity by the defendant Rubin Rocker, whom he alleges is the bona fide publisher of "Who's Who

in the Western Hemisphere." (Such an employment in an editorial capacity as alleged in the answer would not be a violation of the restrictive covenant in the agreement.)

The answers of the three defendants deny the allegations of the supplemental complaint which impute to these defendants a scheme or conspiracy to controvert and circumvent the provisions of the aforesaid restrictive covenant.

■ The defendant Rocker raises a further defense of laches on the part of the plaintiffs in that they failed to take any legal steps to preserve and secure their alleged claims for a period of about a year after they had full knowledge that defendant Rocker was attempting to publish this book. I find against this contention. The time which elapsed between the said alleged discovery and the commencement of this action is not unreasonable. The delay in filing the present action does not constitute laches such as to bar the relief sought herein.

The first question to be passed on is the validity of the contract made between the plaintiffs and the defendant Schwarz on March 4, 1940.

The individual defendants Rocker and Schwarz by their answer contend that the said contract is illegal, void and unenforceable because it is a contract in restraint of trade; that it is oppressive, harsh and unreasonable and injurious to the public interest and contrary to the public policy of the State of New York; that it unreasonably restrained Schwarz from carrying on his trade and that its provisions were more than necessary to protect plaintiffs from any alleged interference.

■ One of the essential elements to sustain a contract of this nature is the consideration. I can't say that there has been any failure of consideration here. There was a cause of action asserted by the plaintiffs against the defendant Schwarz. It was compromised and settled. This contract is the result. That is sufficient consideration. The forbearance to prosecute an action is a valuable consideration which will support a promise. Joffe v. Bonn, 3 Cir., 14 F.2d 50.

The essential question is whether or not this contract was void because it is a restraint of trade and contrary to public policy. This contract without doubt removed from competition with plaintiffs a rival and competitor in business, but such a contract is not necessarily regarded as a contract in restraint of trade. It did not close the field of competition, except to a particular party. Wood v. Whitehead Brothers Co., 165 N.Y. 545, 59 N.E. 357; McCall Co. v. Wright, 198 N.Y. 143, 91 N.E. 516, 31 L.R.A.,N.S., 1249.

In construing such a contract it is not the right of a particular individual that we are most concerned with. It is the right of the public. Is it a matter of public interest, of public concern?

The contract is very general as to time and place but that does not necessarily make it void.

The tendency of adjudication has been marked in the direction of relaxing the rigor of the doctrine that all contracts in general restraint of trade are void irrespective of special circumstances. Diamond Match Company v. Roeber, 106 N.Y. 473, 13 N.E. 419, 60 Am.Rep. 464.

■ The test is this; that, when the restraint provided for in the contract is general, but at the same time is coextensive only with the interest to be protected and with the benefit meant to be conferred, there seems to be no good reason why as between the parties the contract is not as reasonable as when the interest is partial and there is a corresponding partial restraint. Diamond Match v. Roeber, supra; Leslie v. Lorillard, 110 N.Y. 519, 18 N.E. 363, 1 L.R.A. 456.

■ Applying this rule to the contract in question and considering all the circumstances I hold that it is not a void but a valid and enforceable contract.

Having disposed of these legal defenses, the next thing to consider is the proof. As I stated before, what the plaintiffs really charge here is a conspiracy between the defendant Rocker and the defendant Schwarz to circumvent and nullify the provisions of the restrictive covenant aforesaid.

This type of charge, of course, is rather difficult of proof. Usually it cannot be proved by direct evidence. Circumstantial evidence as a rule plays a great part in the proof of a charge of this kind. So, in this case.

In order to arrive at a correct solution one must examine fully into the various bits of evidence and then view the whole result. It will be necessary, therefore, for

me to review at some length the evidence of this case.

In the first place, we should take into consideration the defendants involved. The defendant Schwarz, commencing about the year 1926, started to publish these biographies, among which were:

Who's Who in American Jewry
Who's Who in the Government
Who's Who in Law
Who's Who in the Clergy
Religious Leaders of America
Biographical Encyclopedia of America

—and others

From the year 1926 down to the year 1940 his sole business had been the publication of this type of books. After the agreement of March, 1940 Schwarz was generally precluded from publishing any books with the words "Who's Who" in the title.

Thereafter, Schwarz was determined to put out a second edition of a book he had previously published "Biographical Encyclopedia of America." He sent out a number of letters to prospective subjects or subscribers. At this time his workshop was at 1114 Kings Highway in the Borough of Brooklyn.

Some time in the year 1941 he apparently abandoned the publication of this book. He says that he did so due to world conditions. One may very well conclude that the efforts of Schwarz were not too productive of results. When he abandoned the project Schwarz had 108 paid subscriptions and 206 unpaid subscriptions.

Some time during the summer of that year, 1941, we find the defendant Rocker starting out to publish a work which in purpose and scope paralleled the abandoned project of Schwarz, with a new name, i. e. "Who's Who in the Western Hemisphere."

The letters of solicitation sent out by Rocker bore almost the identical legend used by defendant Schwarz giving the purpose and scope of the work, "A Biographical Encyclopedia designed to promote Pan American cultural relationship and to advance the cause of Hemispheric solidarity."

These letters and the enclosed blanks sent out by Rocker were substantially identical with the letters and blanks sent out by Schwarz.

As a matter of fact the letter sheets used by Rocker were copied from those used by Schwarz, with only such changes as were necessary by reason of the change in name.

Rocker used the same workshop as Schwarz, 1114 Kings Highway, Brooklyn, New York, and for a time both had the same mailing address in New York City. Rocker took over most of the employees of Schwarz.

Schwarz, who was an expert in this type of publishing, claims that due to world conditions it would not be profitable to publish his new work. Rocker contends that nevertheless he practically a novice determined to get out such a work. Rocker's only experience had been by way of doing some work for Schwarz in an editorial capacity. This term of employment did not extend over any great period of time. Rocker had never published a book.

Rocker's previous employment had not been in this field. He had about three years of college. While at Brooklyn College he was taken ill and was really out of commission for about 2½ years. He did some tutoring while at college and for a time thereafter. He began his business life in 1933 doing radio repair work.

Later in 1937 or 1938 he was one of the proprietors of Puritan Products, manufacturing creams for the face. In 1937 he worked on and off for three months for Schwarz who then was getting out "Who's Who in the Law."

In 1938 he worked on and off for six months for Schwarz in connection with "Who's Who among Physicians and Surgeons." In 1939 Rocker was one of the owners of a business known as the Modern Diathermy Company, at 1114 Kings Highway. This company manufactured diathermy machines.

In 1940 Rocker, Schwarz and another were in business at 1114 Kings Highway, carrying on the National Fluorescent Company, which was engaged in the sale of fluorescent lamps.

That partnership was still in existence in the summer of 1942 and during part of this time "Who's Who in the Western Hemisphere" was in process of publication. Rocker also worked as an electrician. During the time he claimed to be engaged in getting out "Who's Who in the Western Hemisphere" he put in 125 full days as an electrician's helper.

There is a bit of a hiatus in the testimony of Rocker and Schwarz as to when

Schwarz abandoned his project and when Rocker took it up. Schwarz testified he started with his new book in the spring of 1941, and abandoned it in the late fall of the same year.

Rocker testified he got the idea to start his book before June 1941. As a matter of fact Rocker on June 23, 1941 filed a certificate to do business under the name of "Who's Who in the Western Hemisphere."

Rocker testified that prior to June, 1941 Schwarz had told him that he (Schwarz) was abandoning the idea of getting out a new book and that it was then that Schwarz and Rocker had this conversation about the new book "Who's Who in the Western Hemisphere."

Schwarz tells a different story. I quote from the testimony:

"Q. Did you tell your brother-in-law that you abandoned the idea of getting out a second edition of Biographical Encyclopedia of America? A. I did not.

"Q. You did not tell him that? A. Not then.

"Q. When did you tell it to him? A. Later in the fall of 1941.

"Q. Did you tell him at that time that you had been thinking of a similar book but had abandoned the project? A. No, sir."

The two stories do not jibe. However, some time during the summer of 1941 Rocker did commence work on the new book and Schwarz apparently retired.

At this point, it is plaintiffs' contention that Schwarz having found that his second edition of "Biographical Encyclopedia of America" was not successful, attempted to again edit and publish a biographical book with the words "Who's Who" in it, and knowing that he was prohibited by agreement not to go into such an undertaking, turned to Rubin Rocker to carry on for him.

Plaintiffs point out that defendant Rocker was the most natural person in the world to act in such a capacity. Schwarz and Rocker were brothers-in-law, they were partners in business, they occupied the same building for business purposes and Schwarz had the organization which he could very well turn over to Rocker.

In addition, however, and bearing on this question as to just what Rocker's place in this business was, plaintiffs have proved further that the attempted publica-tion of this new book was no small undertaking; that at least $40,000 had been collected from between 4 to 5,000 subscribers and yet Rocker when he renewed his automobile operator's license on January 15th described himself as "unemployed"; On July, 1942 in applying for supplemental gas ration for his automobile in response to the question "What is the principal occupation of the principal user of the vehicle", his answer was "Electrical Servicing."

On his application for renewal of the supplemental gas ration on several occasions in response to the question "principal occupations—be specific" he answered, "Electrician". In one of these renewal applications in response to the question as to his "Industry, business or profession", he stated it to be "Electrical Servicing and Electrical maintenance and Electrician."

It should be noted that the times when these applications were made, Rocker was living about 25 miles from the place where the new book was being worked on; on July 28, 1943 in writing to the Bronx Ration Board for additional gas coupons, Rocker described himself as in the business of "Electrical Servicing", "Fluorescent and neon sign service", and again "Electrical Servicing."

As part of the whole picture and in showing the true relationship between Rocker and Schwarz, plaintiffs have proved that although Schwarz testified that he abandoned his project some time during the summer of 1941 and left the premises 1114 Kings Highway at the end of the year 1941; the telephone at 1114 Kings Highway was in the name of Schwarz up until March 25, 1942 and that Schwarz was the subscriber for the electricity in the said premises up until September 26, 1942.

As bearing on the whole question also is the question of books of account of both Schwarz and Rocker. Schwarz had no books and produced none; Rocker produced few books and showed a disinclination during the whole trial to produce any books.

There is no paper of any kind to show what occurred between Rocker and Schwarz when it is claimed that Schwarz abandoned his project and Rocker took up a new one. There was some money paid over for the paid and unpaid subscriptions. Both Rocker and Schwarz are

somewhat indefinite as to the amount and the manner of payment and there is nothing to show what moneys were invested by Rocker in his new venture.

There is a dearth of books on many important issues. Rocker testified that he had invested about $4,000 in his project. His explanation of where the money came from is not too satisfactory. No book was produced showing any investment by any one. Rocker claims to have worked for Schwarz for a period of about nine months in two years. There is no record of any payment for said services on any books produced. Schwarz is claimed to have done some editorial work for Rocker. There is no record of any payment for his services. Both Schwarz and Rocker stated that the payment was by cash. All other employees were paid by check.

I have gone into the evidence with some particularity because a case of this type, as I stated before, is difficult of proof. Many facts and circumstances, perhaps seemingly unimportant when standing alone, must be considered as part of the whole picture.

The facts and circumstances to which I have heretofore referred to might very well engender in one's mind a suspicion that Schwarz was using his brother-in-law Rocker as a screen for the operations forbidden by the agreement of March 4, 1940. I would hesitate to say, however, that up to this point plaintiffs had made out a case against these defendants.

This brings us to a discussion of the testimony concerning the meeting at Lundy's on May 15, 1942 and the testimony of Larkin.

The meeting at Lundy's did take place. At this meeting was Schwarz, Loffer, Leven (a printer) and Olliphant (a lawyer). Leven testified that the meeting was brought about by Rocker; that he, Leven, met Rocker and discussed the printing of the book "Who's Who in the Western Hemisphere"; that Rocker told Leven that he, Rocker, needed an "angel"; that he needed $20,000 to get the book out; that Rocker named Loffer as one of his associates and some one else who was not named. Leven testified that Rocker and Loffer saw him again and that at this meeting the question of getting $20,000 in the business was discussed; that during this conversation the name of Schwarz was mentioned as one who would run the business if either Rocker or Loffer were drafted; that at this meeting arrangements were made to have Leven meet Schwarz. This meeting took place on May 15, 1942.

I do not propose to go into details as to what was said at this meeting. Leven was posing as a man who might have $20,000 to invest.

The purport of the conversation was that Schwarz was behind the publication of "Who's Who in the Western Hemisphere."

It is summed up by this quotation from the testimony of Leven as to what Schwarz said: "I will make a clean breast of this thing. I am the man behind this but I cannot let my name appear on account of an injunction by 'Who's Who in America', which they obtained against me."

Olliphant, an attorney formerly from the office of the attorneys for the plaintiffs, corroborates the story told by Leven. The next day Olliphant prepared a statement of what had occurred at the meeting. He refreshed his recollection from this statement the day before he testified and while he was testifying. Olliphant's version of what was said at this meeting does not differ from that given by Leven. The following extract from Olliphant's testimony generally summarizes the tenor of the talk:

"Mr. Loffer said he was putting out this book of 'Who's Who in the Western Hemisphere', and he expected to be inducted in the Army very shortly and that Mr. Schwarz would run the enterprise. Mr. Schwarz said that he had another project in view or he might have another project in view with Mr. MacLeish, which was a Government project, which he thought it was his patriotic duty to perform, but that his real life work, he said, was to put out a 'Who's Who'. Actually he would prefer to be in the 'Who's Who' field."

"Then we spoke later on, that is, as the conversation progressed, we spoke about the possibility of forming a corporation."

"Mr. Chapman: The witness says 'we.' Let us know what he refers to."

"The Witness: By that I mean Mr. Leven, Mr. Loffer and Mr. Schwarz. I myself did not take any particular part in it. I was just listening.

"A. (Continuing) Mr. Leven suggested that Mr. Schwarz would be the president of such an organization. Mr. Schwarz then said, "Well, actually, I must keep in

the background because there is an injunction against me being an officer of any corporation putting out a "Who's Who" book. However, this injunction does not prevent me from working as an employee'. He stated—this was toward the end of the conversation and after a few drinks had passed—he said he wanted to be absolutely frank with Mr. Leven before he started to go into it, and he wanted to tell him the truth about the situation. However, as a matter of fact the organization that he had now was actually his. He had assembled the personnel there, the girls, and was actually running the venture and would continue to run the venture but he would have to have someone at the front.

"Another part of the conversation when they were speaking of Mr. Leven's participation in the venture, the question about Mr. Rocker came up. Mr. Loffer said Mr. Rocker was to put some money in the organization, but anything that he and Mr. Schwarz would do would be all right as far as Mr. Rocker was concerned, and that anything that Mr. Loffer or Mr. Schwarz said, Mr. Rocker would agree to; that he was merely a man who invested money in the thing but he would agree to any arrangements that they might make. * * *"

"He said he would do all of the actual work in the organization; that he knew this business but he could not appear as an executive, but he would really manage the situation."

Rocker denies that he ever talked to Leven on the telephone or that he ever met Leven personally. Schwarz denies that the conversation related by Leven took place. However, there was such a meeting and the reason Schwarz gave for being there did not convince me.

Defendants contend that Leven's testimony "was so full of perjury that the court must reject it entirely."

This I cannot do. Leven did spar a bit when he was asked to tell just what the purpose of this meeting was in so far as he was concerned. There is no question but that he was posing as a man who had $20,000 to invest but was he not too ready to admit this on the witness stand.

Still, on the whole, I believed him. He was corroborated in all details of the meeting by Olliphant. The fact that this meeting was planned so that evidence might be obtained against the defendants does not convince me that Olliphant commited perjury.

The testimony of the witness, Thomas J. Larkin, also deserves consideration.

Larkin had been in the publishing business in Boston. He had put out several "Who's Who" books. Larkin got in touch with Schwarz in November of 1940. He had been sued by the A. N. Marquis Company for copyright infringement. Larkin was seeking information about these plaintiffs. He and Schwarz had this one thing in common; both had been sued by the plaintiffs for copyright infringement. From then on and until early in 1942 there was an exchange of letters between Schwarz and Larkin and some telephone talks.

Larkin testified he talked to Schwarz over the telephone in July 1941 and that then Schwarz said he was interested in a new book, a hemispheric volume; that it was a very fine book and would bring the people of the north and south together; that in connection with it he was using a legend "to promote hemispheric solidarity"; that he had a book that would put "Who's Who in America" on the spot; that in this same conversation Schwarz tried to interest Larkin in "Who's Who in the Western Hemisphere" and also tried to interest Larkin in printing other "Who's Who" books for Schwarz; Schwarz to remain a silent partner, inasmuch as he was precluded by an agreement from doing it himself.

Larkin further testified that in the early part of 1942 they again discussed promoting "Who's Who in the Western Hemisphere." Generally the conversation was that if Larkin came into the proposition he was to look to Schwarz for his money.

Larkin also said that around March of 1943 he talked on the telephone with Schwarz, who told him that he (Schwarz) was still interested in getting a printer for "Who's Who in the Western Hemisphere." It is a bit significant that after this and on June 27, 1943 Rocker wrote to Larkin and asked him to submit an estimate on the publication of "Who's Who in the Western Hemisphere."

Another letter written by Schwarz to Larkin is rather significant.

I am satisfied that the meeting at Lundy's took place on May 15, 1942.

The next day Schwarz wrote to Larkin among other things as follows: "I have

a very interesting business proposition that I would like to discuss with you at your earliest convenience—Several others have evinced a keen interest, but I would prefer discussing the subject with you first."

The explanation given by Schwarz as to the proposition referred to in this letter is not very convincing.

Defendant Schwarz does not deny having telephone talks with Larkin but he does deny that he ever told Larkin the statements imputed to him.

Defendants ask me to disregard the testimony of Larkin; they say he is not telling the truth; that he is in the employ of the plaintiffs and that his story should be viewed with suspicion.

I have gone over his testimony with this in mind. It is true that Larkin has some sort of an arrangement with the plaintiffs. Plaintiffs obtained a judgment of $9,000 against Larkin. Subsequently Larkin and plaintiffs made some kind of a compromise by which plaintiffs could have use of any of Larkin's manuscript and material, and as a matter of fact they exercised this option as to the book "Who's Who in the East."

At the end of a certain period and after an audit the profits of the sale of this book are to be divided, a part to Larkin and a certain percent to be paid on the judgment. In the meantime Larkin has a drawing account of $100 a week.

Without doubt Larkin felt bitter toward plaintiffs about the suit and the judgment. Now as the result of this compromise without doubt his feeling has changed. I do not question but that now he has a friendly feeling toward plaintiffs. At least he was friendly enough to tell plaintiffs of the Schwarz' telephone calls and letters. Is he friendly enough to make up these conversations out of whole cloth? I cannot believe it. Larkin on the witness stand rather impressed me as a truthful witness.

I have been somewhat lengthy in discussing the evidence in this case. I have done so because of the serious consequences to these defendants in the event of a decision against them.

As I view the whole case, all of the evidence, including that of Leven, Olliphant and Larkin, I can only conclude that plaintiffs have made out a cause of action against defendants on the first count of the complaint.

Both Schwarz and Rocker, in spite of their close relationship, deny that Schwarz ever told Rocker of the agreement of March 4, 1940. Rocker denies that he ever knew of it until this suit was started. There is no direct proof that Schwarz ever did tell Rocker of this agreement. However, it is one of the several essential facts of the case which I regard has been proven by indirect or circumstantial evidence.

Plaintiffs made no attempt to prove any actual damage resulting to them. There is no testimony from which I might compute any fixed sum by way of an award of damages. Therefore, none will be allowed.

Plaintiffs are entitled to a decree enjoining and restraining defendants, their agents, servants and employees from in any editing, publishing, compiling, distributing, selling, or vending the work entitled "Who's Who in the Western Hemisphere" together with the costs of this action.

The second cause of action is based on unfair competition in that defendants in the proposed publication of this book "Who's Who in the Western Hemisphere" are unfairly competing with plaintiffs and their book, "Who's Who in America."

By reason of my holding as to the first cause of action I deem it unnecessary to pass on the second cause of action.

Under the first cause of action plaintiffs have obtained all the relief they could have obtained under the second.

There is only one offending book involved, "Who's Who in the Western Hemisphere."

The finding in favor of plaintiffs as to that cause of action gives plaintiffs full and complete relief.

A finding in favor of plaintiffs as to the second cause of action would give them nothing more than the injunction which I have provided for. No damages were proven under the second cause of action.

I am all the more pursuaded that I should not delve into this last cause of action because plaintiffs rely to a great extent in sustaining it upon the evidence necessary to sustain the first cause of action. As a matter of fact in the complaint plaintiffs plead as part of the second cause of action the allegations of the first cause of action.

Settle decree on notice.